the state of Illinois and John Horton, Defendant McClellan, Attorney General on behalf of Defendant McClellan, Attorney Mr. Joshua Chetford, Attorney General on behalf of the plaintiff's athlete, Attorney Ms. Sally Swift. Are both of you ready to proceed? We are ready. And you've both been informed by our staff that we're going to extend the argument time to 20 minutes for each side. So you may proceed then when you're ready. Oh, which reminds me, there were two motions to cite additional authority. I assume there was no objection from either side? There was not an objection. Then we will grant both of those motions. Thank you.  Your honors, may it please the court, if I may introduce my co-counsel, Stephen Drizzen, D-R-I-Z-I-N. I will also say that a member from amicus council, Kara Kapp, is in the audience as there are amicus briefs in this case. Your honors, there are many moving parts in this case. And so we are seeking, to be clear, the reversal of the denial of leave to file the five constitutional claims that were raised below. Four, of course, relate to the conviction. And one relate to the life without parole sentence given to my 17-year-old client. The four relating to the conviction, of course, are the ineffective assistance of direct appellate counsel relating to four pretrial confessions of Clifton English. And then new evidence on three other claims. Two relate to state's witness, Lynn Hollingshed, the ineffective assistance of counsel for failing to investigate. And then withheld evidence relating to Mr. Hollingshed as well. But I do intend to focus on the last, the other issue. And that is that new evidence demonstrates the absolute, actual innocence of my client, John Horton. Why is the, this court's ruling in rule 23 affirming the defendant's conviction not the law of the case with respect to English's post-trial confession? Your honor, because people of the Ortiz states very clearly there is no, a new actual innocence claim is a new claim. There's no limit in people of the Ortiz, for example. That was a third actual, a third actual innocence claim, a third post-conviction petition. But it was, it raised a different piece of evidence than this case. This case, the evidence is English's post-trial confession. This is the, the, that is fundamentally, there are, there is more than that. These are, let's talk about the confession for the first part, though. These are fundamentally different confessions. Before, these are, the intended audience is fundamentally different. Well, they're not different. They're not new under the rule that it, it cannot be something that's merely the same principle piece of evidence dressed up in another way. Isn't that really what this is? Your honor, I, I disagree with that. This is fundamentally different new because it's new people who have come forward with that information. It is his psychotherapist at the, at the prison who came forth new and said, Clifton English, confess to me. There is a new letter that Clifton English voluntarily sent to the Winnebago County State's Attorney's Office saying, I did it, not John Horton. And it is a confession he gave to the Internal Affairs Division of the Hill Correctional Center, another law enforcement confession. Those are fundamentally different. And I do think. What's different about the statements? Well, the actual substance of the statements are extraordinarily more detailed than they were. There's never been a hearing at all to determine any of them. We have a statement to the Internal Affairs Division of Hill, for example, that identifies the victim's jacket that he was wearing, a Hard Rock Cafe jacket. Something that is not mentioned anywhere at all in any police reports or anything like that. Isn't it in a police report? It is in a medical examiner's report buried in, it's the only place I've ever seen it that it was collected from the victim at the time. But it does exist in the record. It does exist in the, it does exist to the extent that it was not in, in, in the record. There is a little bit of dispute about that. It's actually a police report of items that were picked up from the coroner's office, correct? Correct. That is correct. It's a police report. It is. And it wasn't mentioned in the trial. It's certainly not in John Gordon's confession, which says that he was dressed as a police officer, which we now know is absolutely not true. You compare other aspects of the case, Mr. English's confession fundamentally describes events that only a true perpetrator could describe. And a rigid determination from the race judicata point, the rigid determination that we should, that without a hearing, that was really, I mean, unfortunately very speculative. John, or Clifton English may be, may be covering for his cousin. Clifton English may have other motivations. That was the whole basis because there was no hearing. There was no one who looked him in the eye or heard his words to determine what he actually said. And if a rigid interpretation of that is going to dictate this 20 years later, because there is no question about the conclusiveness, the conclusiveness of Clifton English's confession. I did it, not John Gordon. That is the law to take as true. That's People v. Smith at this stage of the proceedings. You must take that as true. So you must take as true that Clifton English is guilty and John Gordon is innocent at this stage. But you must meet the requirements of factual innocence, which is that it's newly discovered evidence. And Justice Burkett's question, you know, speaks to the Tepper case, I think it was, or Tenner case. You know, you're taking the same claim and dressing it up. You're adding a lot of detail to it. Why did it take your client 18 years, you know, after three other post-conviction petitions to get detail to a confession he knew existed back in 1995? Well, he certainly knew it existed, but to say that it's just dressing it up, I think there is law in support of my position. We talked about People v. Ortiz. I'll talk about People v. Carl Williams, which says, I believe the language is that filling in client's previous details, whatever, that were previously known, from the same witnesses, the same eyewitnesses in those cases. The operative fact in Carl Williams was there were two brand new affidavits submitted, correct? That's in Salvador Ortiz there was a new eyewitness. I believe in People v. Carl Williams there was an individual, a new affidavit that butchers previous affidavits from those same witnesses that were considered in that case. So the question of why my client didn't bring this forward earlier, well, again, it's not in his control. It's in the control of the man who committed this crime, Clifton English, of when he is going to come forward. And what does Clifton English tell us in his various sworn affidavits and letters? He said, I found God, and that's one of the reasons, the motivation of why I came forward. I didn't come forward earlier to tell the truth, or I took the Fifth Amendment at trial at the advice of my trial attorney. And because I never believed that my cousin John Horton would get convicted of a crime because I did it. This is not a very, you know, and again, I appreciate the argument. That's a very common claim. That's common. It happens routinely when you have, for example, affidavits from people in the penitentiary. Now, we just ruled on a case very similar that the person came forward because he didn't think the state's case was strong against that defendant. So, again, I think with regard to prejudice, you've made a strong argument, but it's cause. The issue is this confession was well known to the defendant. There was 18 years to fill in the quote unquote details that you're discussing. How about let's talk about the trial court's exclusion of English's pretrial confession. Sure. Well, the trial court's exclusions of, can I say one thing about the cause point for a moment? I mean, cause is not a factor in an actual innocence case. It's obviously the new is what we're talking about here. And I understand that. But when we talk about cause, the state is going to get up here and say it's not objective. I want to know why it's not objective that a 17-year-old who is, I mean, here are the facts that we pledged. And this is a verified petition. A 17-year-old boy who was arrested, who locked himself into the police station, 17 when taken into custody. He didn't have any counsel for his prior petitions. He wasn't 17 when he filed his first post-conviction petition. And he was locked up in a maximum security prison the whole time with limited access to a law library. This is all pledged. So some of the witnesses who support him on some of the other claims, the appeals, including Clifton English, are locked up in the Illinois Department of Corrections. There's administrative regulations that don't allow communications to them. Those are objective factors. The objective, whether a reasonable person under those same considerations would be able to bring it forth earlier. And I think that's plenty objective. And I think that there's no exception of the law that needs to be made to find that that is adequate cause and that is the reason why it's new. Is our court's dismissive language that you referred to regarding English's post-trial confession, would that have maybe led the defendant to believe it would have been useless to raise those pre-trial confession issues in a post-conviction petition? I think that's absolutely true, of course. I mean, when you have something like that, he didn't have counsel to go back and address it. He didn't have someone who could contact a psychotherapist to know that that could happen. He certainly didn't know that Clifton English sent letters to the Linnebago County State's Attorney's Office. And these are all factors, objective factors, that are frustrating, certainly, as someone who went in prison as a 17-year-old boy and has spent the last 23 years there. I do want to turn to the exclusion of the pre-trial confessions. Because for the same reasons, or for even greater reasons, of course that is cause. Here we have a fundamentally erroneous decision. And that is clear, okay? Because it is fundamentally erroneous, not because the judge relied on a rule of case law or a horn book that was incorrect and applied the wrong law. Because a case from this district, People v. Cocorales, said 10 years earlier that these are the factors, that we consider all of it, and that there are four aspects to the Chambers test. And in that same Cocorales test, that two of the factors favored admissibility of the pre-trial confessions. When we're talking about those factors, it's whether, you know, the confessions were made to someone that they know and with a relationship with, whether it was someone who was short in time, whether there's other corroborating factors to say that it's reliable. Now, we did that same analysis in this case. And arguably, I think clearly, in fact, that there are more factors, three of the four factors. The only one is that Clifton English couldn't be cross-examined because he took the fifth at the time. Your analysis on that is under prejudice, correct? The analysis under that is under prejudice. But clearly, let me, if I can just have two seconds, the standard in that case comes from a case under Cathy, 2012, Illinois, 111746. And that is, for deficient performance, if you look at this, you say, arguable whether a reasonable attorney should have raised it. And you look at the importance of the issue at trial and the state of law at the time. I've talked about the state of law at the time, Cocorales clearly. And Cathy, by the way, the only, they said the state of law at the time was good enough to have raised it. And there wasn't even a case that was favorable. There was only one case on the point at all that actually went against the defense in that case. And they still, still found a reasonable attorney arguably should have raised it. And then you look at the importance of the issue. And if there's any debate about the importance of the issue, there should be none. Again, you're talking about prejudice, but can you talk about cause a little bit? What is the exact cause, objective factors? And I know you went over this a little bit when you were talking about newly discovered evidence. But what do you argue as cause for this ineffective assistance for appellate counsel? Okay, sure. For cause and prejudice, the question is, did John Horton fail to establish as a matter of law cause and prejudice or is the supporting documentation insufficient? The supporting documentation is Cocorales. I mean, that's, it's the case law. That, I mean, in an issue like this. So the question is, did we fail to establish cause as a matter of law? Is there, were there objective factors that led him not to raise it earlier? So, I mean, in the context of this case, and there's cases from the U.S. Supreme Court that support this, First Carrier, 477 U.S. 478, and others, that, think about this. That you're appointed counsel to represent you because you can't do it alone. Okay? You can't recognize these complicated legal issues. You're in a maximum security prison. You don't have access to a library. You're not a lawyer. You were locked up at 17 years old. And you were appointed a lawyer to raise the appropriate issues for you so you can get relief. That lawyer failed. That lawyer failed under prejudice if we acknowledge that. How is a pro se defendant, what is it, 180 days later or 90 days later, supposed to, who has, who has, who has hitched his wagon, so to speak, had appointed counsel to that, who missed it, how is that objectively, is he supposed to meet it under those same standards? And that's what those cases stand for. How does the exception not swallow the rule if you're talking about pro se? Do you know how many, what percentage of PCPs come from pro se people in the Department of Corrections who relied on their attorneys at trial and now they're by themselves? Sure. I mean, I would say, what, 90% maybe that come into the circuit court? Absolutely. And it doesn't swallow. So that's caused that. If they're pro se and they're young and they're inexperienced in the law and they relied on their trial court counsel, then that's caused. And it, what you have to look at is, arguably, and Kathy is enough arguably, but you have to look at the substantive issue. I mean, we're talking, I think there is some overlap between cause and prejudice here in this specific context for deficient performance of appellate counsel. Because, no, not everyone who comes in and says, I wish my appellate counsel lays that and can come up with 10 cases that arguably are sort of on point. We're talking about fundamental cases that are on point here, that are absolutely, I think, at least on the, or what's the standard, arguably, entitling the relief. And that's what's important, and that's what this state does. Not every state has this fundamental miscarriage of justice exception for actual innocence or a cause and prejudice exception. And if you look back to the original purposes of those rules, if you look back to Pitts and Barger from 2002, why do we establish those rules? It is because of this court's, this state's, these courts' concern that, yes, there's an interest in finality. But finality does not trump it when we have significant evidence, significant, powerful evidence, like we have well-pled facts, or even greater than well-pled facts, that show there might be an unconstitutional conviction or a wrongful conviction or an actual innocence. That trumps it in this state. And so, and it's also an acknowledgment in this state, when we have third and fourth petitions going forth and raising it and allowing these claims to go forth, that we need to hear more. And we acknowledge that sometimes these pro se petitioners that you say are 90 percent, sometimes they can't garner enough evidence in the first go-around, within 90 days of their dismissal of their direct appeal. Sometimes it takes a little bit longer. And we think that's so important in this state. But didn't Hodges, you know, kind of change the paradigm a little bit? I mean, because now when you have a pro se, it's easier to get past first stage. You really don't have to garner all this evidence. You really just have to say, put on a pro se thing, say, you know, these confessions of Inglis should have been allowed at my trial, and the trial judge was wrong and my attorney was ineffective for not raising that appeal. I mean, how hard is that? You don't need to garner a bunch of law and affidavits for that, do you? Well, to the extent that Hodges fundamentally changed the law for a first post-conviction petition, needless to say, it was decided well after any appeal in this case. So to the extent that Hodges stands for the idea that the first post-conviction petition in this case should have advanced, that is, you know, it's sort of this, puts us in an odd place in the law. If we want to, can I have a minute to finish up? I think that was someone else's phone. Oh, I apologize. So you're fine. Okay. No, it's not. Oh, okay. To the extent that, I'm sorry, I lost my train of thought. Take a minute. Okay. Hodges wasn't the law in 1995. Thank you, Your Honor. I mean, to the extent that we are willing to keep a real man here, and I think sometimes we lose track of this when we're talking about Kazanu, a real man who's serving life without parole in prison because of a change in the law that now should have gotten relief earlier, but now that relief is no longer available to him. Well, I'm not saying it should have earlier, because, I mean, if you read his first post-conviction petition, there wasn't a whole lot in there that probably would have survived first stage under Hodges either, I mean, realistically. I don't disagree with that. And you're arguing prejudice, and, you know, I think Justice Burkett indicated you've got prejudice locked down in your arguments. I mean, the question is newly discovered on one end and cause on the other end. And, I mean, you agree that these are elements that you must meet in order to get past this stage, correct? I agree that that is the law in this state. There is no question about that we need to meet those elements. But I do want, and I don't want to avoid the question because I do think there is law that supports it. I think Williams. I think Ortiz. I think all these other cases I've cited in my brief support my position that these are fundamentally a different claim, that they couldn't have been brought earlier because of all sorts of circumstances. And we haven't even gotten to the other new evidence. Bob Harrell is here today in support of us. I mean, Bob Harrell is plainly new evidence that couldn't have been brought forth earlier. Despite what the state says. You mean he says that I didn't tell anyone. I didn't tell anyone my misgivings. And I regret it. And that's what his affidavit says. And I wish I did. And imagine how powerful that is. And I know I'm getting into prejudice again. But imagine a juror hearing that. I know I wasn't asked this question. I'm Bob Harrell talking. I know I wasn't asked this question. But I just feel compelled to say right now, Your Honor, a jury, that kid at the defense table, that wasn't the one I saw. That's not him. Because that's what you have to take as true. And I watched it happen. But Bob Harrell, just like Michelle Jackson, was known to the defendant as being a witness. All those years he could have been interviewed by someone. He was not. He had the opportunity to be interviewed. He was certainly. But, again, he did not tell his misgivings to anyone. He didn't know until he got on the stand. He told his misgivings only after reading an article where you were actually quoted. I was quoted. But we have an affidavit of what that says. And that must be taken as true. The state can speculate about nefarious motives. The state can speculate about that it was contaminated in some way. But that's not what it says. And that's what a hearing is for. That's where it's tested out. All of their arguments compel a hearing, compel to test out whether their theories are right or my theories are right. And I welcome that. Okay? But so I think all of those factors go specifically to that. Now I believe that is the correct time. So I appreciate your indulgence. I do ask, do you have any other questions? If you would like, we would like to hear your remarks on sentencing, and so we'll give you some additional time. And, of course, counsel, we will extend you the same courtesy. Okay. You know, in many ways I filed three motions to cite additional authority on the sentence issue. In some ways I did it reluctantly. I mean, the sentence only happens if not for the unconstitutional conviction. So I want that to be clear. But the law has been evolving so much in this area that, of course, it's important for you to know what's going on. And, really, I think we can start at the end. Obviously we'll be brief, but I think the motions to cite additional authority are really the most important things in this case. And Montgomery changed everything, and now the Illinois courts and other courts are applying Montgomery. And the state, what does Montgomery say? Montgomery says that only the rarest of juveniles, only the rarest, what's the phrase they use? The incorrigible juvenile. And that's versus one who is just transient immaturity. And those are the vast, vast majority. So the state wants you to apply Holman, case out of the 5th District, which is post-Montgomery. I want you to apply Nieto, case out of the 1st District. The Fats and other cases, I cited the Georgia case. The Georgia case is very significant because they had previously not applied it to juveniles discretionarily. But they specifically said, if it weren't for Montgomery, we would have said the previous sentencing hearing in that case would have been fine. And we would have upheld.  And what is Holman? Holman has a, the facts of Holman, I lost track of my notes a little bit here, but he had two murder convictions on his record, another attempt murder. I mean, we had a judge who specifically talked about the age. We had a defense attorney who brought it up. I will go to bat against Holman and the sentencing in this case where he was, where. We do not have comparative review in Illinois. Excuse me? We don't compare case to case. And I understand your point. You should focus on the facts of this case. Did the trial court give the defendant's youth due consideration in light of the lack of any substantial criminal history? What he said, there was no criminal history. We had three traffic offenses. We know that. So I won't compare anymore. But we know what the judge said. He said, I want to send a message far and wide to other youth in this community. That's what he was thinking about you. And we know, in fact, in Yale, they say specifically that deterrence doesn't work for kids. It doesn't work. That doesn't work that way. So it is specifically not a factor under Miller or Montgomery. We know that he said you must, the trial judge said, you must be taken from society and put someplace because society can't live with you. And evidently, you can't live in society. A 17-year-old boy with no prior convictions, I mean, needless to say, in a case that was hotly, hotly disputed, there is no way that he can live in society? I welcome, I urge, I beg for a sentencing hearing to show you exactly how well my client, John Horton, could live in society. And we knew it at the time. I'm not even asking you to consider all these other factors, which I guarantee at a sentencing hearing will overwhelm the trial court with how amazing of an individual this person is. But we knew it when he was 17 years old because we have a letter from his GED teacher in the record who talks about he's this rare and extraordinary young man who has taught other people, Spanish-speaking individuals, while he's locked up in the Winnebago County Jail, to be these people he's never given aid. We have records in the court saying he never so much has made a peep or any problem during the court proceedings. But isn't the issue whether or not the trial court made the proper considerations at the time the sentence was imposed? The issue is whether the trial court properly considered whether or not he is the rarest of juveniles who is incorrigible and will never change, or whether his alleged actions reflect transient youth. He did acquire the gun. Excuse me? He did acquire the gun. Mr. Horton, I have... And he accompanied, taking his statements as true, he did accompany his cousin to do the armed robbery the night before. And let's think... So the trial court did have some evidence, substantial evidence, in aggravation aside from the facts of the armed robbery murder. And let's talk about that in the context of sentencing, right? Who was he with on the night before? He was with his 25-year-old cousin, and we talk about in Miller and Montgomery that juveniles are particularly vulnerable to peer pressure, familial pressure, that they can't be judged by that. So him waiting in the car, whether he'd been new or not, for him acquiring a gun because his mom, by the way, is because his mom kept getting broken into, these were inappropriate and wrong actions to take, no question about it. And if we want to charge John Horton for having an unlawful use of a weapon, for not having a FOIA card when he was 17 years old, fine. But he is charged with murder, and those factors, all of those factors that we talked about with those other sort of criminal acts that we want to talk about are tailor-made for exactly what Miller and Roper and Graham and Montgomery and all the Illinois case law applying it are saying that's exactly how youth behave. Okay? And they don't make good decisions. And a 17-year-old kid, if we take ourselves back to when we were all 17, if your older cousin who you respect because your dad's not in your life, because your mom has a drug problem and she's sick, and you have brothers and family who also have their own problems, if that cousin is a role model to you, is a one-adult role model to you, that's a problem. And that's not a problem because that's John Horton's making. That's a problem for any youth. And there's no question that he is not the rare incorrigible youth. So unless there are any other questions, I thank you for your graciousness. Thank you for this. And I do ask that you vacate and leave the file for all five of the substantive issues. Remand this case back to a different judge. Thank you. Good morning, Your Honors. I'd like to start with the newer Alabama case and then go to the other issues since that's where counsel left off. Right now, obviously, we have the newer case of Montgomery v. Louisiana. And that case does not really change anything. It does have some expansive language in it, but that language is dicta. But even in the absence of controlling authority in our jurisdiction, we look to United States Supreme Court dicta. And Montgomery does leave open and suggest that even in non-discretionary natural life sentences, trial courts are obligated to give full consideration to a defendant's youth, correct? And it should be reserved for the worst of the worst, essentially. It does say that. That's what it says? It does, yeah. It does definitely open the door to say- Is he the worst of the worst? Is John Horton the worst of the worst? No criminal history of any kind? Is he the worst of the worst? Well, as Your Honor pointed out, he does have a criminal history. He doesn't have prior adjudication of any sort. Do traffic tickets count as criminal history? No, I don't believe that they do. So what criminal history does he have? His criminal history is what he himself said he had, which is- Aside from the facts of this case, no other criminal history at all? No, except for, like I say, the day before where he did go with his cousin and attempt a robbery. He was there as the getaway driver. He certainly played a part in that. He supplied the gun. He says he had the gun again and decided to do this yet again. But all those events took place in the course of 36 hours, correct? That is correct, yes, Your Honor. Is there any other criminal history? No, nothing other than traffic. Was Nieto wrongly decided? Was Nieto wrongly decided? Yes, it is, yes. Because I do believe that when you look at the language, not only in Miller v. Alabama, where it's clear that it is only talking about those where there was no discretion given to the trial court to determine these types of factors in terms of youth. And then in the Montgomery case, it says after they only determined that it has retroactive effect, that particular case, and that is, again, a case where there was no discretion exercised. And it says giving Miller retroactive effect, moreover, does not require the state to relitigate sentences, let alone convictions, in every case where a juvenile offender received mandatory life without parole. I don't think the expansive language, I mean, we can look to it and say that that shows where the court may be going. But this is, of course, a case with three justices dissenting also. The court may never go there. But it certainly, at this point, we don't have anything to say that it applies to discretionary cases. And I think that it should be limited to the facts that were in front of the Supreme Court and what was decided. Moreover, even if you say it does apply in some way or that we can look to the dicta and say, well, you know, we have to look at that and really something should have been considered in terms of his youth. It was considered here, unusually, I would say, back in 1993. But is that sufficient? Was that sufficient consideration? I believe it was, Your Honors, because the attorney specifically argued that this person who's before you now at the age of, I think, 20, is not, you know, at the age of 17 when he did these acts, he's not going to be the same person at 27. He's not going to be the same person at 37. So, therefore, you have to look at what's happened in the interim. He has been a model prisoner. You know, so this is not the same person, and you have to consider that. And with that argument, that really is the argument that we have to look at. The Supreme Court has now set forth, the U.S. and both our own, has set forth that we have to look at did the youth play a factor, a factor such that this is not going to be the same person, and I think that that was before the trial court. The trial court said it considered, you know, the arguments and the pre-sentence report and all the evidence in front of it. I believe this was considered by the trial court, and it's so determined now. You know, I mean, there can be an argument, I suppose, that it made the wrong determination or something, but I don't think it fits within the ambit of Miller v. Alabama or Montgomery v. Louisiana. You know, you're referring to uncharged criminal conduct, and that brings up one of the other issues, the Brady claim, the uncharged offenses against Lynn Hollingshead that were pending at the time he testified that were not disclosed to the defense. Can you talk about the Brady violation? Yes. Well, it makes two arguments, both that there was a shooting incident of some sort that involved him and, I believe, Taylor, which is one of the people that is talked about throughout in terms of part of the defendant's group of friends and also part of Hollingshead's group of friends. And what I would say there is that even in terms of what we have on the record, we don't know, you know, in terms of showing cause and prejudice, we don't know anything about that, nothing. So, you know, to say that, well, it looks – We don't know anything about it because the state didn't disclose the details. Right. Well, that's – The juvenile records are confidential. Right. And you have a prosecutor in another statement, in another Hollingshead case, reflecting his juvenile history. Why isn't that good enough? Why – and you're required to take it as true. Right. That is correct. But taking it as true, I guess what I'm saying is that there is nothing to show. We have to show – or, excuse me, we don't – the defendant has to show. And it's very important – I just want to speak sort of broadly to this first. It's very important that cause and prejudice – they're part of the PC statute. The statute gives a remedy, but only under these circumstances. So these things have to be shown. We can't look past the fact that, you know, in this particular case, it's subjective, but that's okay. Or in this particular case, it's – you know, we can look past the prejudice requirement. Well, what's subjective about his inability to find this record when it's not available to the public? Well, Your Honor, I would suggest that if what we have in here that shows – I think it was a state's attorney's statement – if that's sufficient, then that would show cause. But what we don't have is prejudice. You have to take what's in that affidavit as true, what they've pled as true. So let's assume that it is true that Hollingshed had this record that was never disclosed and he was a suspect in a pending shooting investigation. Why is that not material? That's material impeachment of a – and according to your own brief, Hollingshed gave important testimony and he was repeatedly referred to in closing argument and rebuttal by the state. He was obviously an important witness for the state, but we also have – he said basically that the defendant had a gun before and after the incident. It had a TAC-22, which was tied to the crime, and also that he admitted his guilt. But as to those two things, we also have Denise Davis who said that she also said that he – she saw him with the gun, the TAC-22, before this. And she also said – and she never – she has an affidavit at some point, I believe, with the first PC, where she recanted, but she did not recant anything to do with the gun. So that stands. She has that. The gun – the defendant places the gun in his hands before the crime. He does, his own statement. In his own pre-confession statement. Right, his own statement. But also in terms of his saying that he had heard defendant make this particular confession, we also have Denise Davis saying that she also had heard it, but on the face of her – you know, on her affidavit, she says something to the effect of, well, you know, I was – at that point I was mad at him. But – Doesn't she also reiterate that she didn't believe a word of it? She does. But Collingsworth says that, too. So in that sense, they are sort of the equivalent statement. Wait a minute. Is it your position that Lynn Collingsworth was not absolutely critical to the State's case, and therefore the lack of or the inability of the defense to impeach him was not critical? Well, that is – I mean, yes, it is. And how could he possibly find confidential juvenile records? Well, I do believe that that's – if that's sufficient, our statement, the attorney's statement in there to show that, in fact, that those were in his record at that time, I do believe that they have cause. I will say that. But then we get to the prejudice, and that's where we say that he is not absolutely the evidence which ties this defendant to the crime. And which, you know – How many times did the State reference Mr. Hollingshed in their closing arguments? Many, many times. But they also referenced Denise Davis many, many times. And we have – like I say, we have evidence putting him with the gun both before and after. We have his confession, which we shouldn't overlook. We shouldn't overlook the confession, but in your brief, you repeatedly argue that it was found to be voluntary. Just because a statement is found to be voluntary doesn't mean it's true, and it doesn't mean it's not subject to attack. Would you agree with that? I would agree with that, yes. Yes, definitely. If I can backtrack just for a minute to the issue of the actual confession. Again, more broadly, I just want to say that, you know, successive PCs are disfavored for a reason. Are you talking about the defendant's confession or Mr. English? I'm sorry. No, I'm actually talking about the defendant's confession, yeah, at this point. But it's disfavored because it's not just finality concerns, but we are really talking about successive bites of the apple. And there's a good reason why, then, they're not given this over and over and over. And that's because the truth becomes much harder to discern every time it goes back. And, I mean, I pointed out that even here, you know, with the best of intentions, I'm sure, another detail was told to the defendant when the latest group came to talk with him, which is, you know, was there anything said to you about the tills? Did you ask, you know, to get the money on the tills, or was it another suggestion? And this type of thing happens over the years, and that's exactly why there has to be some finality, there has to be some requirement that, in fact, he meet all of the requirements for a claim of new innocence. There's no question you are correct about that. The system is designed for one trial, and hopefully there is one trial, but sometimes that is impossible because errors are made. How about the trial court's ruling on the pretrial statements of Robert English? And, you know, what I found troubling in reading the record is that even Judge McGraw, in ruling on whether or not he was going to allow the defendant to file this post-conviction petition, this successive petition, confused this court's language in our Rule 23 order, which basically dismissed English's post-trial confession with the pretrial confession issues. Isn't that cause for a pro se defendant not to understand that that would be a viable claim? He confused it. I'm not sure what you're referring to. The trial court referred to our language in the Rule 23 order saying, Robert, that this court found English's confession to be. Oh. And we never ruled on the pretrial. This court has never ruled on the admissibility of his pretrial confessions. Isn't that cause for why a pro se defendant would not understand that he could even raise that claim when our court had already basically said English's statements are not worthy of belief? Well, I mean, the actual Rule 23, you know, makes it clear what they're talking about. So the fact that the trial court, I guess, misstated that. Well, he misstated it after reading the petition, and presumably we know for a fact that he read this court's original Rule 23 upholding the conviction. So my point is that how can we expect a pro se litigant to understand he might have a claim of ineffective assistance of counsel when a trial judge ruling on his petition is making a mistake? Well, you know, obviously if the judge made a mistake, that's, you know, that's something that, you know, he didn't read carefully or something to that effect. But I don't think that necessarily shows that, you know, once that this is an open issue. Because, again, it has to be objective. There has to be cause and there has to be prejudice. We're looking at, in terms of the chamber's requirements, the trial court went through the factors, and I know there were a few statements there that were certainly ambiguous and may have even suggested initially. The trial court never heard from these witnesses. There was no hearing. He took the offer of proof and then waited for English to take the fifth and ruled. That's correct, yes. But, right, he did. But that's because there was no offer of proof on these witnesses either as to, I mean, I think he, there was, I'm sorry, there was an offer of proof, but there was no live testimony. Pardon me, there was no live testimony, but there was an offer of proof. Yes, yes. And without saying, let's hear from the witnesses, he just waited for English to take the fifth and then ruled. No, he did not, because he was not waiting just for a single factor of any sort. If so, he would have just ruled, but he didn't. Where did he articulate the record? Well, I believe he said, I believe then he opened it up for argument on, you know, he said he had to wait for that factor because it is one of the many factors that are considered in reliability, but he did not say that once that was determined and if he did, this was out. He said, I'll wait for that, then he got it, and then he asked for argument about the factors. And I think his very initial statement maybe early on before he even waited to see if, in fact, the fifth was going to be taken, he actually said something to the effect of, you know, one of the cases that had talked about just using one factor. And, or that you have, I'm sorry, that you have to have all the factors or it's out. And so he brought that up. The court, the assistant state's attorney very alertly corrected him and said, that's not the case, your honors. All four have to be, you know, considered and then, you know, it's a weighing, so depending upon which circumstances, you know, which of these factors are shown and which are not, it is then your determination. The court said, I totally understand. He hung his hat on one factor. He what? He hung his hat on one factor. On what, on the fifth? No, yeah, on reliability. Well, I think he waited to find out, but I don't believe he hung his hat on that. I think he said, well, there were two factors, in fact, that he found. He said both that it wasn't made shortly after the crime. Which was wrong. He was wrong on the facts as well. That's not necessarily true. To most of these people, it was anywhere from two to five days. And there's a lot of law that says that even two days is considered to be late. So I don't believe he was wrong on that fact. And also, I think, you know, just like in Coccarellas, which I don't think is exactly on all fours with this case, for a lot of reasons. And one of those reasons is that in Coccarellas, they said, well, it wasn't made to somebody close in time that was a close friend of his. So, you know, that could be considered against him. But it was made to police officers. So there's additional reliability in that. And that's obvious. But what we need to do is also, you know, the Chambers factors are not exclusive. Correct. Here we have multiple individuals who are either close acquaintances or friends of Robert English. Isn't that a factor? Isn't that a factor? Not in this case. I believe just like, you know, again, they're not exclusive. And you have to look at it in terms of this case. In this case, it doesn't work. And the reason it doesn't work is because it's an unusual case. These same people were also, you know, friends of and or mostly related to the defendant. That goes to believability, not reliability under Chambers and its progeny. Just because a trial court has questions about the believability of a third-party confession witness does not mean it's inadmissible. The trial court has to basically do a, you know, a preview and determine whether or not there are sufficient number of factors to supply an additional reliability. And then you let the jury make the decision. Here the trial court just waited for English, listened to the arguments, and ruled. I respectfully disagree. I don't believe, you know, he did wait for the arguments. What language can you point to where he's articulated his rationale? I don't have the language directly in front of me, but certainly he talked about how there are two factors. And I don't believe he was wrong on the factor of it not being, you know, shortly after the crime. Well, there are cases, and I think you point them out in your brief, two days has been determined to be a short period of time. And here it's the first opportunity. He has to speak to the individuals. He's giving them the gun, telling them to get rid of the gun, hide the gun because I used it to commit a murder. But again, you know, this is, again, a weighing by the court in terms of the way it determines those reliability factors.  Right. It only heard the offer of proof, but it was never asked by defense either that they hear the live testimony of these. And I don't believe it was necessary because these factors, the facts underlying these factors were in front of the judge. And he knew these factors and considered them. And I think in terms of Your Honor's argument that it really is then just a waiting, I honestly think that somebody that this one factor just doesn't work in this case. And I believe that it actually doesn't go to reliability and that that has to be looked at. Just like, you know, in terms of if it's not a close acquaintance, then, you know, then it's not reliable. That's not the case. If you're giving it to a police officer, there are simulating circumstances. And I believe those are, you know, in this case, the circumstances show that that factor is does not show reliability. Was there corroboration for Robert English's statements, the pretrial statements? Was there corroboration? Oh, his pretrial statements that he committed the crime? Right. Well, you know, in terms of just that he had done it and then somebody had gone in and committed a crime there and shot somebody near the door. Yes. In terms of like his later confession where. Let's just talk about the pretrial statements. On this issue, the corroboration, there was corroboration, correct? He did have access to the gun. He was John Morton's cousin, correct? Yes. And according, I mean, this is the language from our court's ruling. English was a black man whose stature was similar to that described by the eyewitnesses. Right. Yes. So he physically was closer. Physically was similar. Physically closer in terms of stature to the descriptions than John Morton himself. Well, that's not true at all. Well, that's what the court said when affirming the trial court's ruling that English could not take the stand to talk about his physical makeup. The court said this. Because English was a black man whose stature was similar to that described by the eyewitnesses, the jurors could have unfairly speculated that English was a suspect in the incident, therefore creating doubt of the defendant's guilt. Because he generally fit within that description. He didn't work closely. In fact, we would argue just the opposite. You know, and Bob Perel, I know, has come forward now, but that's only, you know, at this late date and after a newspaper article in which it was said. No, he was never asked to identify the defendant in open court. He was not. No, he was not. Do you have any particular thoughts on why an eyewitness was not asked to identify the defendant in open court? I do not know why that was not done. You know, I only can say that, you know, the defense obviously had the right to interview him and talk to him. Well, the defense counsel didn't interview much. He didn't interview any of the witnesses that might have contradicted Hollingshed's statements. He didn't interview Harrell. He basically didn't interview anybody other than his own client. Well, he interviewed Carl Hobson, who is one of those people that now is one of the seven, I believe, because he was called as a defense witness and said that that phone call never came in at the time that Hollingshed said it did to Carl's home. That was pretty much it. With respect to corroboration, English was a suspect originally, correct? He was brought in to, yes, to be interviewed. So he was a suspect. The police thought he might be good for this, correct? That's correct. He absolutely was investigated as a possibility. And he physically resembled the perpetrator? If your Honor just believes it's like a 60-pound difference. I'm relying upon our own court's interpretation. Right, but it shows that he is apparently, you know, even the DOC sheet shows him as something like 80 pounds more. But, of course, that was taken later. In your brief, you know, you talk about propensity and the evidence that he is a violent criminal, that that's not admissible. Does it have to be admissible to show reliability or show corroboration? Does a piece of evidence that's offered or proposed to show that Robert English's confession is worthy of belief or statements are worthy of belief? Because he's the type of individual who commits these offenses, does the criminal history have to be admissible in order for a trial court reviewing an effort to introduce these statements? It doesn't have to be admissible, does it? Can't the court look to and say, yeah, this is probably the type of individual who committed that offense? Well, I would suggest that propensity in those terms certainly doesn't add anything to the reliability. And if we have propensity from him, then we certainly have it from this defendant who says by, you know, that he, well, and also English's confession, who the two of them were together at this very same McDonald's. And we would have the same sort of propensity evidence, in fact, very specific to this. If the police are looking for a person who may have committed an offense in a community, isn't one of the first things they do is to look at the criminal histories of individuals within the area to see whether or not this or that person? I would think that that's a consideration. Yeah, well, and what's good for, you know, if the police can do it, why can't the trial court do it? You know, this guy's got a horrible criminal history that is corroborative of that statement. Well, I think that more importantly, you know, you look at the statement and determine in terms of the reliability of whether he could have done it in terms of the Chamber's types of factors. You don't really look to determine whether or not, you know, that would be more of an evidentiary determination made at a later point. That's my point. It's not a fact that's going to be in front of a jury. It's not a definite point. It's something the trial court can weigh in saying whether, yeah, there's corroboration for that. Well, I don't think that can be made until later until it's determined whether or not under the legitimate factors and factors that are similar to those in Chambers are first determined. At that point, perhaps it could be considered. Unless Your Honors have other questions. The manager of the McDonald's suggested that the perpetrator in the night of this event had the same voice, and he thought it was the same person that had previously robbed the McDonald's? Yes, but that manager was down in the basement while this was taking place. Nonetheless, he was able to hear. He was able to hear. And he said it was a prior robbery from a year before, and he said he believed the voice was the same.  That's correct. That's the woman who was. But she also was impeached somewhat by the fact that she never came forward. She said she knew the defendant. She knew it wasn't him. And yet she was, you know, giving statements. She was identifying people or not identifying people from the lineup and never yet said, you know, you had the wrong person, never once. One last issue you didn't raise, but if we were to remand this, should we require that the chief judge in Winnebago County assign this to a different judge? You know, Your Honors, there really isn't a lot of law on that, obviously. That's why I'm asking you. Yes. The biggest case, I believe, is the one that addressed it. And in that case, the judge had jumped ahead by several ‑‑ I think had jumped ahead to basically making evidentiary rulings at a time when the facts should have been taken as true. And the court said it had prejudged it. I haven't seen another case like that. I think that, you know, as I said in my brief, it's generally considered that there, you know, that you would get the same judge who is familiar with the facts. And the fact that a judge errs and makes a decision which turns out to be reversed on appeal does not necessarily mean the judge cannot be fair. So unless there's something in this case which the defense can point to and say that's where the judge is impartial, has already prejudged this, I don't believe that's the case. And in this case, I didn't see any of that, and I would ask this court just to send it back again so that the same judge, if possible, would be the person to hear it again. Okay. All right. Thank you, Your Honors. Thank you. Counsel, your rebuttal? Yes, please. I'm going to start near the end where they left off. Obviously, there's quite a bit I'd like to say. Obviously, this is an impassioned case for me. This Michelle Jackson not coming forward, I'm just going to start right where we left off. She's a 17-year-old girl. I mean, a teenager, a peer, to not come forward to the police where no idea what's going on is almost meaningless. And when we're talking about, Your Honor Jorgensen, when you ask, isn't it unusual in effect that Bob Harrell wasn't asked an eyewitness to identify? Not only was Bob Harrell not asked, Mary Casey wasn't asked, Patrick Kenny wasn't asked. There was no eyewitnesses. There was many there. Mary Casey is the un-uniformed, non-uniformed manager who was there. By the way, Clifton English identified that she was the manager and knew she was non-uniform. Spent the most time with him. Was there right next to him with the tills or whatever. And she wasn't even asked on the stand whether she could identify him. This is very, very unusual and suspect. How was he dressed? How was the perpetrator dressed? The perpetrator was dressed in, he describes it himself, mostly described in dark knee, what's the word, like army fatigue pants, which he identifies that he was wearing. He was wearing a mask covering him. Yeah, it would be a tough identification, but you think they would at least be asked if they could identify him. And certainly Mr. Harrell was able to identify, or people were able to identify voice. People were able to identify that it was dark skinned, older, body type, stockier. I mean, look at page 18 of our brief. I mean, look at those pictures. Look at who that is. I mean, you tell me, based on all of the evidence, all of the content, whether it's the, whether they want to focus entirely on the trial testimony about it, fine. Or if you want to testify based on the objective witnesses four hours after this horrible thing just happened to him. You tell me, and the appellate court decision says it. You tell me which it sounds more like. I would say overwhelmingly it sounds more like it. You know what else they didn't hear about Clifton English? We're talking about they didn't hear the pretrial confessions. We're talking about that they didn't hear about modus operandi or the fact that another suspect who was in prison now was convicted of a very similar restaurant robbery murder in Rockford. If that's not modus operandi, I don't know what is. We didn't hear that. Well, it's not. Okay. It's not. I mean, it certainly could be developed with additional facts that it could be. I mean, there's certainly a. Potentially, but just. Potentially. Not on its face, not what's in the brief. It's not them all. Okay. Well, what they also didn't hear was what we talked about, that Clifton English very much would have looked like it. They didn't see any pictures. They didn't get to present him in court. They didn't get to hear him take the fifth. And they didn't get to hear about his false alibi to the police. And that is established by the police record. That's established. Something never investigated by the police. That his own wife. His own wife said, no, he is not telling the truth. We did not meet those neighbors until days after the offense. And I was not with him the night of this murder because I was at work. And you know what? You can go get my restaurant. My, my, my, my pay stub receipt. Do they ever do that? Is there any indication that they ever did that? No, they didn't. Because they had at that point gotten a confession from John Horton. And it's almost, almost blows my mind how little we've talked about that confession from John Horton. Okay? Because here we are. We're, we are, um, if they're not hitching their wagon to Lynn Hollinshed, he's not important. Then what are they hitching their wagon to? They're hitching their wagon to John Horton's confession. And if we don't know by now that confessions taken under police interrogation from a 17-year-old kid, unrecorded so we don't know what happened. And I'm not even saying that that means that the police did this on purpose. But I'm saying these are intense interrogations. And if we don't know that that can happen at this point, then I don't know what to tell you. But this court does know that. We know that because this court in Keeble v. Rivera, Juan Rivera, 2011, outright reversed a case. Outright reversed. I'm asking for leave to file to start a case. Outright reversed. Not just be a confession, but we had three snitches in that case, too. Three snitches. But it wasn't enough. Now, you can say DNA in that case. We'll never have DNA in that case. That doesn't mean that it's not a false confession. Okay? And if we don't know that, we should learn from DuPage County and Brian Dugan. And we should learn from Rolando Cruz, who also confessed to this case. And if we don't know, and he has pointed out over and over again, that sometimes these third-party confessors who are saying it over and over again, guess what? Sometimes it's true. I know it's a passionate argument, but focus on the facts here that you should have been entitled, and that's your argument, that it was ineffective assistance to not allow Robert English's pretrial statements. Can you address the arguments of the State on that point? That the trial court did not abuse its discretion, that it properly considered the Chamber's factors and ruled properly. There's very little else to say, although I will say that everything you're saying, Your Honor, about if there was any sort of hearing, it was for show only, because he had said specifically, and I don't remember the exact quote I tried to find, but it was something like, you know where I'm heading with this. You know where I'm going with this. As soon as he learned that he was going to take the fifth, and as soon as he heard the fifth, he foreshadowed, and he said, you know, you're bringing up an opening argument at your peril. But, you know, I mean, so it was to the extent there was any additional analysis on the case, it was nil. And it was clear factual error on the point about whether it was time. She says it was two days could be time. He said it was 30 days for one of them. And by the way, some of them, I said in the brief, and again, I can't find the record site, but I believe some of them were the morning after, Monday morning. This offense was on Sunday, so we're talking about one day. We're talking about less than one day. And we're talking about corroboration where he says there's a newspaper article where he did it, where he says about the right amount of money, where he talks about bags, where he talks about these things. And if you want to talk about close acquaintances, how could you ever not have a close acquaintance or a family member in this case? Does that rule out any time that the true perpetrator is a cousin that a third-party confession can't come in because they're both going to be related to whoever else they talk to? Are they both, I mean, this sort of father figure to my client, John Horton? Of course they're going to know the same people. Who else are they going to confess to? There can't be a rule that says fundamentally that none of those can come in because they're going to be closely related to the 17-year-old too. Your argument is that all those arguments from the state go to weight, not admissibility. Of course, of course, and that's why that needs to be heard from the jury. And what do we know about the jury in this case? We also haven't even brought that up. We know the jurors wanted to hear all this stuff about Clifton. That's a business rebuttal that the state did not address that. I notice that your time is up. However, given the nature of the case, I will give you a minute or two to just sum up your thoughts. Okay, the last thought I want to say, and again, I don't mean this to cast aspersions to the state, but I just want to say broadly how much this state is concerned about innocence. And there are procedural hurdles, and I understand that. But look at the newly amended Professional Rule of Conduct 3.8 in the state, amended on January 1, 2016, that applies. And that says, G22 says, If a conviction was obtained in the prosecutor's jurisdiction, and I'm not casting aspersions. I'm just saying how important it is innocence in this jurisdiction. The prosecutor must undertake further reasonable investigation or make reasonable efforts to cause an investigation to determine whether the defendant was convicted of an offense that the defendant did not commit. It is so important in this state. We care so much about miscarriages of justice, maybe because we've had so many in this state, that we have a rule, 3.8, just amended that's saying, Don't worry about procedural hurdles. If a prosecutor knows about information, we have to look into it. And that's all I'm asking. Don't we have to worry about procedural hurdles? Don't we have to follow the Supreme Court? I mean, we're an intermediate court of review. We are not the Supreme Court. You could be in front of the Supreme Court right now and asking for a supervisory order where they could just issue an order saying, You get a third stage hearing, have a nice day. We can't do that. You absolutely do. And I believe there is more than enough case law that says exactly everything that I'm saying. All of these are objective factors. And all of these cases that I've cited absolutely allow you to do that to the extent there's concerns about whether the Illinois Supreme Court, whether you have concerns about that. My point is the Illinois Supreme Court wants you to do that. The state wants you to do that. They want to err on the side of justice and not finality. And I will leave it at that. Thank you both very much for spirited arguments. And we are in recess.